IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION


ALICIA ANN COLVILLE                                                    PLAINTIFF


         v.                              CIVIL NO. 17-5024


NANCY A. BERRYHILL,[1] Commissioner
Social Security Administration                                         DEFENDANT


**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**


Plaintiff, Alicia Ann Colville, brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration (Commissioner) denying her claims for a period of disability and disability insurance benefits (DIB) under the provisions of Title II of the Social Security Act (Act). In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. See 42 U.S.C. § 405(g).

**I.        Procedural Background:**

Plaintiff protectively filed her current application for DIB on May 21, 2014, alleging an inability to work since May 31, 2013, due to congestive heart failure (CHF) or cardiac problems, memory problems, sleep problems, headaches, knee problems, back pain, dyslexia, and depression. (Tr. 220, 253). For DIB purposes, Plaintiff maintained insured status through

---

[1] Nancy A. Berryhill, has been appointed to serve as acting Commissioner of Social Security, and is substituted as Defendant, pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure.

December 31, 2018. (Tr. 18).  An administrative hearing was held on July 30, 2015, at which

Plaintiff appeared with counsel and testified. (Tr. 49-98).

By written decision dated January 27, 2016, the ALJ found that during the relevant

time period, Plaintiff had an impairment or combination of impairments that were severe.  (Tr.

18).  Specifically, the ALJ found Plaintiff had the following severe impairments:  congestive

heart failure and chronic diastolic heart failure with a history of aortic valve replacement,

recurrent right patellofemoral instability, right patellofemoral joint osteoarthritis and right

lateral meniscus tear status post-surgery, obesity, headaches, insomnia, obstructive sleep

apnea, and depression. (Tr. 18).  However, after reviewing all of the evidence presented, the

ALJ determined that Plaintiff's impairments did not meet or equal the level of severity of any

impairment listed in the Listing of Impairments found in Appendix I, Subpart P, Regulation

No. 4. (Tr. 18).  The ALJ found Plaintiff retained the residual functional capacity (RFC) to:

> perform the full range of sedentary work as defined in 20 CFR 404.1567(a)
> except the claimant cannot climb, can occasionally balance and stoop, and
> cannot kneel, crouch or crawl.  She must avoid concentrated exposure to
> temperature extremes, noise, fumes, odors, dusts, gases, poor ventilation and
> hazards.  She is able to perform work where interpersonal contact is incidental
> to the work performed; tasks are no more complex than those learned and
> performed by rote, with few variables and little use of judgment; and the
> supervision required is simple, direct and concrete.

(Tr. 20).  With the help of a vocational expert, the ALJ determined Plaintiff could perform

work as a toy stuffer, tile table worker, and eyeglass frame polisher.  (Tr. 26).

Plaintiff then requested a review of the hearing decision by the Appeals Council, which

denied that request on December 19, 2016. (Tr. 1-3).  Subsequently, Plaintiff filed this action.

(Doc. 1).  Both parties have filed appeal briefs, and the case is before the undersigned for report

and recommendation.  (Docs. 11, 12).

The Court has reviewed the entire transcript. The complete set of facts and arguments are presented in the parties' briefs, and are repeated here only to the extent necessary.

## II. Evidence Presented:

At the time of the administrative hearing held on July 30, 2015, Plaintiff was forty years of age and had a limited education. (Tr. 53-54). Plaintiff obtained a certified nursing assistant certificate. (Tr. 55). Plaintiff's past relevant work consisted of working as a purchasing agent, inventory clerk, receptionist, and file clerk. (Tr. 57-63, 93, 230-232).

A review of the pertinent medical evidence reflects the following. On February 21, 2012, Plaintiff underwent an echocardiogram (EKG) and moderate to severe aortic regurgitation was noted. (Tr. 562-565).

On March 23, 2012, Plaintiff underwent a left heart catheterization, and the results yielded a referral for aortic valve replacement surgery. (Tr. 376-379, 546-549). Normal coronary arteries were observed. (Tr. 377).

On April 9, 2012, Plaintiff presented herself to Northwest Medical Center and complained of heart palpitations and worsening chest pain, shortness of breath, and a 30-pound weight gain over the past three to four months. (Tr. 306-307, 540-541). An EKG revealed moderate to severe aortic regurgitation and an ejection fraction of 50-55 percent. Plaintiff was diagnosed with palpitations and congestive heart failure. (Tr. 307). On the same day, Plaintiff underwent an aortic valve replacement with a mechanical valve. (Tr. 309-310, 312-313, 538-539). Plaintiff was discharged after four days. (Tr. 309-310, 536).

On April 24, 2012, Plaintiff returned to Northwest Medical Center complaining of dizziness and shortness of breath. (Tr. 304-305, 530-531). An EKG showed cardiac tamponade and pericarditis. (Tr. 304-305, 558-561). Plaintiff underwent an immediate pericardial drain

3

placement to relieve the symptoms. (Tr. 311, 535).  It was reported that she experienced immediate relief.  Plaintiff remained in the hospital for five days. (Tr. 311). On April 29, 2012, Dr. Robert Jaggers, M.D. and Dr. James Counce, M.D. removed the drain, and they noted she returned to sinus rhythm. (Tr. 308, 534).

On May 5, 2012, Plaintiff presented herself to the emergency department of Northwest Medical Center and was admitted to the hospital. (Tr. 373-374, 384-387, 532-533, 554-557). She complained of chest and neck pain, orthopnea, and headache. (Tr. 373).  An EKG showed mild pericardial effusion and no tamponade. (Tr. 374).  A head computed tomography (CT) scan showed no acute intracranial abnormality. (Tr. 374).  On May 8, 2012, Plaintiff was discharged after she reported feeling better without chest tightness or dyspnea. (Tr. 374).

On May 30, 2012, Plaintiff presented herself to Dr. Jose Loyo-Molina, M.D., a cardiologist, for a three-week follow up visit after her most recent hospital stay. (Tr. 368-371). Plaintiff reported that she felt better, but continued experiencing palpitations and left-sided pain with shallow breathing. (Tr. 368, 371).  Dr. Loyo-Molina diagnosed her with aortic valve replacement, congestive heart failure, and she remained at functional class II. (Tr. 371).

On June 15, 2012, Dr. Mandu Kalyan, M.D. conducted a sleep study and diagnosed Plaintiff with mild obstructive sleep apnea syndrome with an overall index of 7.2. (Tr. 478-479).  Dr. Kalyan recommended a continuous positive airway pressure (CPAP) titration study, supervised weight loss, treatment of restless legs syndrome or periodic limb movements, and evaluation of insomnia etiologies. (Tr. 479).

On August 27, 2012, Plaintiff presented herself to Dr. Kalyan for a CPAP device follow up visit. (Tr. 471-476).  Plaintiff was diagnosed with obstructive sleep apnea, mild obesity,

rapid eye movement (REM) behavior disorder, history of aortic valve disorder, and nicotine dependence. (Tr. 475). Dr. Kalyan encouraged compliance with CPAP device use. (Tr. 475).

On November 27, 2012, Plaintiff presented herself to Dr. Loyo-Molina for a six-month follow up visit. (Tr. 364-367). Plaintiff reported that she felt much better and had recovered strength. (Tr. 364). She complained of chest pain that relieves on its own, shortness of breath, palpitations, and dizziness. (Tr. 364). Dr. Loyo-Molina found her chest pain was atypical. (Tr. 366). Plaintiff was ordered to undergo an EKG and pulmonary function test (PFT). (Tr. 366).

On December 4, 2012, an EKG was conducted. (Tr. 360-363, 380-383, 550-553). The EKG revealed mild (stage 1) left ventricular diastolic dysfunction. (Tr. 362). The remainder of the results showed normal global and regional left ventricular systolic function; trace mitral regurgitation; and a normally functioning mechanical prosthetic valve in the aorta. (Tr. 362). Dr. Loyo-Molina noted Plaintiff's congestive heart failure remained at functional class II. (Tr. 362).

On April 23, 2013, Dr. Loyo-Molina noted that Plaintiff underwent a hysterectomy on March 14, 2013, and she returned for a follow up visit to check her prothrombin time with international normalized ration (PT/INR) after Coumadin was discontinued for surgery. (Tr. 356-359). Plaintiff's INR during the visit was 3.5. (Tr. 356). Plaintiff admitted to smoking one pack of cigarettes daily since she was 20 years old. (Tr. 357). Dr. Loyo-Molina diagnosed her with status post aortic valve replacement, congestive heart failure, status post hysterectomy, aortic valve disorder, mild mitral regurgitation, and status post emergent pericardiocentesis due to tamponade and cardiogenic shock. (Tr. 358). No medication changes were suggested. (Tr. 358).

5

The medical evidence continues after the alleged onset date of May 31, 2013.  On June 30, 2013, Dr. Kalyan found Plaintiff's obstructive sleep apnea was improving. (Tr. 511). Dr. Kalyan encouraged Plaintiff to quit smoking. (Tr. 512).

On October 29, 2013, Plaintiff returned to Dr. Loyo-Molina for a six-month cardiac follow up visit. (Tr. 342-346).  Plaintiff complained of palpitations, but denied chest pain or shortness of breath. (Tr. 344).  Plaintiff requested a Xanax refill. (Tr. 344).  Dr. Loyo-Molina diagnosed her with aortic valve replacement, congestive heart failure, history of artificial heart valve, diastolic heart failure, and anxiety. (Tr. 345).  Dr. Loyo-Molina discontinued Aspirin, refilled Xanax, and took lab work for PT/INR.

On April 15, 2014, Plaintiff presented herself to Dr. Robert Wilson, III, M.D. to reestablish primary care. (Tr. 461). Dr. Wilson noted Plaintiff's INR goal was 2.5-3. (Tr. 461). Dr. Wilson diagnosed Plaintiff with insomnia, aortic valve disorder, obesity, and fatigue. (Tr. 462). Dr. Wilson began managing Plaintiff's anticoagulant therapy, and instructed her to begin a new dose of Coumadin at 5 mg on Monday, Wednesday, and Friday and 7.5 mg the remaining days of the week. (Tr. 463).

On June 2, 2014, Plaintiff had a six-month cardiac follow up visit with Dr. Loyo-Molina. (Tr. 320-323).  Upon exam, she was 5'4" tall and weighed 195 pounds. (Tr. 461). Dr. Loyo-Molina noted Plaintiff had stable exertional dyspnea, palpitations, and lower extremity edema. (Tr. 322).

On June 13, 2014, Dr. Wilson provided a Medical Source Statement-Physical. (Tr. 1011-1012).  Dr. Wilson assessed Plaintiff could frequently and occasionally lift and/or carry ten pounds. (Tr. 1011).  Dr. Wilson found Plaintiff could stand and/or walk with usual breaks a total of two hours, and she could stand and/or walk continuously for 30 minutes. (Tr. 1011).

Dr. Wilson also assessed Plaintiff could sit with usual breaks a total of four hours, and sit continuously for 30 minutes. (Tr. 1011). Plaintiff had unlimited push and/or pull abilities. (Tr. 1012). Dr. Wilson found Plaintiff could frequently reach, handle, finger, and feel. (Tr. 1012). Plaintiff could occasionally climb. (Tr. 1012). Dr. Wilson assessed Plaintiff could never balance, stoop, kneel, crouch, or crawl. (Tr. 1012).

Plaintiff was unlimited with her sight and speaking abilities. (Tr. 1012). Dr. Wilson noted Plaintiff should avoid heights, temperature extremes, and vibration. (Tr. 1012). Dr. Wilson wrote the assessed limitations were found because of Plaintiff's heart valve replacement and bad knees. (Tr. 1012). Dr. Wilson further noted Plaintiff could not do physical activities due to chest pain, shortness of breath, fatigue, dizziness, and knee pain. (Tr. 1012). Dr. Wilson's statement included consideration of pain, discomfort, and/or other subjective complaints. (Tr. 1012). The time period assessed was from 2012 to the date of the assessment. (Tr. 1012).

On July 7, 2014, Plaintiff underwent an EKG and it revealed the following: normal right chamber structure; normal left atrium structure; mild concentric left ventricular hypertrophy; normal global and regional left ventricular systolic function; mild left ventricular diastolic dysfunction; mild mitral regurgitation; tilting disc mechanical prosthetic valve in aortic position with mild stenosis; mild tricuspid regurgitation; mild pulmonary regurgitation; and no evidence of pericardial or pleural effusion. (Tr. 514-519, 542-545, 633-638).

On July 15, 2014, Plaintiff was diagnosed with headaches, and Dr. Wilson prescribed Gabapentin. (Tr. 758).

On July 22, 2014, Dr. Loyo-Molina provided a Medical Source Statement-Physical. (Tr. 1013-1014). Dr. Loyo-Molina assessed Plaintiff could frequently and occasionally lift

and/or carry ten pounds. (Tr. 1013).  Dr. Loyo-Molina found Plaintiff could stand and/or walk with usual breaks a total of four hours, and she could stand and/or walk continuously for half an hour. (Tr. 1013).  Dr. Loyo-Molina also assessed Plaintiff could sit with usual breaks a total of four hours, and sit continuously for two hours. (Tr. 1013).  Plaintiff had a two-hour limit regarding push and/or pull abilities. (Tr. 1014).  Dr. Loyo-Molina found Plaintiff could frequently reach, handle, finger, and feel. (Tr. 1014).  Plaintiff could occasionally kneel and crouch. (Tr. 1014).  Dr. Loyo-Molina assessed Plaintiff could never climb, balance, stoop, or crawl. (Tr. 1014).  Dr. Loyo-Molina found Plaintiff had no environmental restrictions. (Tr. 1014).  Dr. Loyo-Molina wrote the assessed limitations were found because of dyspnea. (Tr. 1014).  Dr. Loyo-Molina's statement included consideration of pain, discomfort, and/or other subjective complaints. (Tr. 1014). The time period assessed was from 2012 to the date of the assessment. (Tr. 1014).

On July 29, 2014, Dr. Wilson noted Plaintiff started Gabapentin two weeks ago for headaches, one dose per day, and she reported the headaches were improving. (Tr. 754).  She reported some intermittent vertigo, but that was present prior to starting Gabapentin. (Tr. 754).

On July 30, 2014, Plaintiff underwent a Tilt Table Test and it was negative for neutrally-mediated syncope. (Tr. 627-632, 660).

On August 19, 2014, state agency medical consultant, Dr. Brett Alberty, M.D., completed a Physical Residual Functional Capacity Assessment at the initial level. (Tr. 108-110).  Dr. Alberty assessed that due to the medically determinable impairments of coronary artery disease with recent aortic valve surgery; ECG on July 7, 2014 that showed an ejection fraction of 55-60 percent; hypertension; obstructive sleep apnea; bilateral knee osteoarthritis; and giving Plaintiff the benefit of the doubt, medical evidence records and credible activities

8

of daily living supported a residual functional capacity of light work with postural limitations. (Tr. 110). Dr. Alberty found Plaintiff could occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for about six hours in an eight-hour workday; and sit about six hours in an eight-hour workday. (Tr. 108). Dr. Alberty assessed Plaintiff's push and/or pull abilities were unlimited other than shown for lift and/or carry. (Tr. 108).

Plaintiff had postural limitations which included: kneeling, crouching, and crawling occasionally. (Tr. 108-109). Dr. Alberty found Plaintiff was unlimited with her ability to climb, balance, and stoop. (Tr. 108-109). Plaintiff had no manipulative, communicative, or environmental limitations. (Tr. 109). Dr. Alberty noted Plaintiff alleged blurry vision and vision changes when she had headaches, but there was no evidence in the medical evidence records to support her allegations. (Tr. 110).

On August 20, 2014, Plaintiff underwent a stress EKG and Myocardial Perfusion Imaging (MPI). (Tr. 617-618). The results showed an abnormal MPI with significant transient ischemic dilatation at 1.33 associated to reversible perfusion defect in the anterobasal wall, and somewhat differential score of eight points. (Tr. 618). The probability of ischemic disease was considered to be moderate to high. (Tr. 618). Plaintiff had a normal global ventricular and left ventricular systolic function, with an ejection fraction of 77 percent. (Tr. 618). She had a normal stress EKG with regadenoson stress protocol. (Tr. 618).

On August 21, 2014, state agency medical consultant, Dr. Jon Etienne Mourot, Ph.D. completed a Psychiatric Review Technique (PRT) at the initial level. (Tr. 106-107). Dr. Mourot cited Listing 12.04, affective disorders, as the listing considered in the analysis. (Tr. 106). Dr. Mourot assessed that Plaintiff had moderate limitations with activities of daily living; mild limitations with social functioning; and moderate limitations maintaining

9

concentration, persistence, or pace. (Tr. 107). No episodes of decompensation were noted. (Tr. 107).

Dr. Mourot also completed a Mental Residual Functional Capacity Assessment at the initial level on August 21, 2014. (Tr. 110-112). Dr. Mourot assessed Plaintiff retained the ability to remember locations and work-like procedures; understand and remember very short and simple instructions; and understand and remember detailed instructions. (Tr. 110). Plaintiff had no significant limitations in her ability to carry out very short and simple instructions; ability to carry out detailed instructions; ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary allowances; ability to sustain an ordinary routine without special supervision; ability to work in coordination with or in proximity to others without being distracted by them; and ability to make simple work-related decisions. (Tr. 111).

Dr. Mourot assessed moderate limitations in Plaintiff's ability to maintain attention and concentration or extended periods and her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 111). Plaintiff did not have any social interaction or adaptation limitations. (Tr. 111). Dr. Mourot noted Plaintiff's limitations arose from menopausal and depressive symptoms. (Tr. 111). Dr. Mourot found Plaintiff retained the capacity to do simple repetitive 1-2 step tasks with limited public or interpersonal contact. (Tr. 112). Dr. Mourot assessed Plaintiff could perform unskilled work. (Tr. 112).

On September 21, 2014, Plaintiff was admitted to Northwest Medical Center after she complained of right sided chest pain that radiated to her back. (Tr. 570-591, 608-616). Plaintiff

reported she stopped smoking in February 2014. (Tr. 610). Plaintiff underwent a left heart catheterization, but it showed no evidence of coronary artery disease. (Tr. 592-605). Plaintiff was primarily diagnosed with acute cholecystitis and chest pain. (Tr. 578). The next day, Plaintiff underwent a laparoscopic cholecystectomy. (Tr. 579, 795).

On November 10, 2014, state agency medical consultant, Dr. David Hicks, M.D. affirmed Dr. Alberty's physical RFC assessment at the reconsideration level. (Tr. 125-128).

On November 11, 2014, state agency medical consultant, Dr. Susan Daugherty, Ph.D. affirmed Dr. Mourot's PRT analysis and mental RFC assessment at the reconsideration level. (Tr. 123-124, 128-130). Dr. Daugherty noted there was no additional evidence regarding mental impairments submitted at the reconsideration level. (Tr. 128-130).

On December 16, 2014, Plaintiff presented herself to Dr. Loyo-Molina and complained of chest pain triggered by activity, exertional dyspnea, palpitations, and dizziness. (Tr. 676-679). Dr. Loyo-Molina assessed that Plaintiff's chest pain was non-cardiac given the results of the coronary angiogram. (Tr. 679). No changes were made to her medication and the next follow up visit was scheduled for six months later. (Tr. 679).

On December 19, 2014, Dr. Wilson noted a disability form was completed regarding Plaintiff's headaches. (Tr. 714-715). Plaintiff reported most of the time her headaches were ocular with pain sometimes. (Tr. 714). She reported the headaches occur multiple times a week and last about one hour. (Tr. 714). Plaintiff stated she lays down until the headache is over. (Tr. 714). Plaintiff experienced blurry vision, photophobic symptoms, and occasional nausea when headaches occurred. (Tr. 714). Plaintiff reported Gabapentin did help some with her headaches. (Tr. 714).

11

On January 14, 2015, Dr. Wilson provided a Headache Questionnaire. (Tr. 675). Dr. Wilson wrote Plaintiff's migraine headaches were usually visual, but sometimes she had pain in the frontal area. (Tr. 675).  Dr. Wilson noted the headaches occurred more than once a week; lasted one hour; had an aura; with symptoms such as nausea, vomiting, and photophobia. (Tr. 675).  Plaintiff's headaches did not require emergency department visits in the last 12 months.  (Tr. 675).  Dr. Wilson wrote Gabapentin was prescribed for prophylaxis, with her response to medications as fair. (Tr. 675).  Dr. Wilson assessed the migraines interfere with Plaintiff's ability to work, and on average she would miss more than one day of work per week. (Tr. 675).

On April 20, 2015, Plaintiff reported right knee pain after kneeling to reach a bottom shelf. (Tr. 682-685).  A right knee X-Ray revealed no fracture, dislocation, or acute findings, but there was some chronic appearing degenerative changes. (Tr. 684). Dr. Wilson prescribed a knee immobilizer.

On April 28, 2015, Plaintiff was referred by Dr. Wilson to Dr. Mark Allard, M.D., an orthopedic surgeon, for her bilateral knee pain with the right worse than the left. (Tr. 812-816).

On May 15, 2015, Dr. Allard read Plaintiff's MRI study results of her right lower extremity and diagnosed Plaintiff with recurrent right greater than left patellar instability; likely had medial instability due to previous lateral release; post-traumatic DJD; patella alta; and an increased TT-TG distance. (Tr. 809-812, 817, 836-837).  Dr. Allard also diagnosed her with recurrent dislocation of the patellofemoral joint and traumatic arthropathy. (Tr. 811). Dr. Allard opined Plaintiff would need a tibial tubercle osteotomy (medial/distal and anterior) and a MPFL reconstruction, and he advised it would be a big operation with lots of rehabilitation afterwards. (Tr. 811).

On June 10, 2015, Dr. Allard diagnosed Plaintiff with recurrent right patellofemoral instability; secondary osteoarthritis, right patellofemoral joint; and right lateral meniscus tear. (Tr. 832-835).  Dr. Allard performed a surgical arthroscopy of the right knee with partial lateral meniscectomy and patellofemoral chondroplasty; right patellofemoral realignment procedure with tibial tubercle osteotomy and allograft bone grafting; and right medial patellofemoral ligament reconstruction with allograft tendon. (Tr. 832).

On June 25, 2015, Plaintiff returned to Dr. Allard for a post-op visit two weeks after surgery, and he instructed her to continue home health physical therapy sessions, increase activity as tolerated, and use a brace for walking. (Tr. 826-830).  Dr. Allard noted Plaintiff seemed to be doing better, and Plaintiff stated she was doing well. (Tr. 826, 828).  Subsequent physical therapy notes indicated Plaintiff was progressing well post-surgery. (Tr. 1006-1008).

On September 8, 2015, Dr. Richard D. Back, Ph.D., a clinical neuropsychologist, conducted a Consultative Examination. (Tr. 1018-1021).  Plaintiff reported she did not drive often due to headaches. (Tr. 1018).  Plaintiff also reported after her heart surgery she was tired all the time, could not perform job duties, and had trouble remembering. (Tr. 1018).  She completed the eighth grade in a resource room and earned a certified nursing assistant certificate. (Tr. 1018).  Plaintiff stated she was allowed to go home if she was tired. (Tr. 1018). Dr. Back administered the Wechsler Adult Intelligence Scale-IV (WAIS-IV), and found Plaintiff functioning in the low average range of intelligence with an 18th percentile and full scale IQ of 86. (Tr. 1019).  The Wide Range Achievement Test-4 (WRAT-IV) was also administered, and Plaintiff was functioning at expected levels in view of her intelligence full scale IQ which did not suggest the presence of a developmental learning disorder. (Tr. 1020).

13

Plaintiff reported to Dr. Back that she did most of the chores and made crockpot meals, but could not lift without assistance and did not vacuum. (Tr. 1020). Plaintiff also reported that she her husband or mother drove her to the store, her husband carried the laundry basket for her, and her husband took over the finances after her first surgery because she had memory problems. (Tr. 1020). Dr. Back assessed that Plaintiff's educational and developmental history was consistent with a diagnosis of intellectual disability; the deficits in adaptive functioning were consistent with intellectual disability; Plaintiff's IQ results were considered valid and reliable; and Plaintiff could not manage funds without assistance. (Tr. 1020).

On September 15, 2015, Dr. Back completed a Medical Source Statement of Ability to do Work-Related Activities (Mental). (Tr. 1022-1024). Dr. Back assessed Plaintiff had no limitations carrying out simple instructions. (Tr. 1022). Plaintiff had mild limitations with her ability to make judgments on simple work-related decisions; carry out complex instructions; and with her ability to make judgments on complex work-related decisions. (Tr. 1022). Dr. Back found Plaintiff had moderate limitations understanding and remembering simple instructions. (Tr. 1022). Dr. Back also assessed Plaintiff had marked limitations understanding and remembering complex instructions. (Tr. 1022). Dr. Back noted Plaintiff's WAIS-IV results indicated very moderate problems with working memory, i.e. concentration. (Tr. 1012). Dr. Back wrote more complicated instructions would be markedly impaired in terms of Plaintiff's ability to remember. (Tr. 1022). Dr. Back did not assess her social activity because a mental status exam was not requested. (Tr. 1023). Dr. Back noted Plaintiff's activities of daily living had marked limitations, and he referenced Plaintiff's report that she could not grocery shop, cook, handle finances, or do laundry independently. (Tr. 1023). Dr. Back found

Plaintiff's limitations began after her heart surgery around 2011. (Tr. 1023). Dr. Back also assessed Plaintiff could not manage her benefits in her own best interest. (Tr. 1024).

### III.    Applicable Law:

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. Ramirez v. Barnhart, 292 F.3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. Edwards v. Barnhart, 314 F.3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir.2001); see also 42 U.S.C. § § 423(d)(1)(A), 1382c (a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§

423(d)(3), 1382(3)(C).  A Plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience.  See 20 C.F.R. §§ 404.1520, 416.920.  Only if the final stage is reached does the fact finder consider the Plaintiff's age, education, and work experience in light of his residual functional capacity.  See McCoy v. Schweiker, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C.F.R. §§ 404.1520, 416.920.

## IV.    Discussion:

Plaintiff argues the following issues on appeal: 1) Whether the ALJ properly evaluated the medical opinions in reaching his RFC determination; and 2) Whether the ALJ fully and fairly developed the record regarding Plaintiff's headaches.

### A.    ALJ's RFC Determination and Medical Opinions:

RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545(a)(1).  It is assessed using all relevant evidence in the record. Id.  This includes medical records, observations of treating physicians and others, and the claimant's own descriptions of his limitations.  Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005); Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004).  Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. § 404.1545(a)(3).  The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual

functional capacity is a medical question." Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001).

Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical

evidence that addresses the claimant's ability to function in the workplace. Lewis v. Barnhart,

353 F.3d 642, 646 (8th Cir. 2003). "[T]he ALJ is [also] required to set forth specifically a

claimant's limitations and to determine how those limitations affect his RFC." Id.

In determining that Plaintiff maintained the RFC to perform sedentary work with

limitations, the ALJ considered Plaintiff's subjective complaints; her medical records; and the

provided medical opinions. (Tr. 20-21). The Court notes that in determining Plaintiff's RFC,

the ALJ discussed each and every medical opinion provided and set forth the reasons for the

weight given to the opinions. Renstrom v. Astrue, 680 F.3d 1057, 1065 (8th Cir. 2012) ("It is

the ALJ's function to resolve conflicts among the opinions of various treating and examining

physicians") (citations omitted); Prosch v. Apfel, 201 F.3d 1010 at 1012 (the ALJ may reject

the conclusions of any medical expert, whether hired by the claimant or the government, if

they are inconsistent with the record as a whole).

Plaintiff argues the ALJ erred in assigning little weight to the opinions of Drs. Wilson

and Loyo-Molina. (Doc. 11). The ALJ did not assign "little weight" to the treating physicians'

assessments, but rather he gave the opinions some weight to the extent that they were consistent

with the RFC determination. (Doc. 11, Tr. 24). Nonetheless, with respect to weight given to

the opinions of treating physicians, "[a] claimant's treating physician's opinion will generally

be given controlling weight, but it must be supported by medically acceptable clinical and

diagnostic techniques, and must be consistent with other substantial evidence in the record."

Andrews v. Colvin, No. 14-3012, 2015 WL 4032122 at *3 (8th Cir. July 2, 2015) (citing Cline

v. Colvin, 771 F.3d 1098, 1102 (8th Cir. 2014).

The explanations the treating physicians provided in support of their limitations consisted of only a recitation of diagnoses and symptoms with no objective findings noted. (Tr. 1012, 1014).  In addition, Drs. Wilson and Loyo-Molina's opinions consisted merely of a checklist form, and they did not reference objective findings to support how the limitations they assessed were determined. See Anderson v. Astrue, 696 F.3d 790, 794 (8th Cir. 2012) (holding that a conclusory checkbox form has little evidentiary value when it "cites no medical evidence, and provides little to no elaboration").  A RFC assessment provided in this format without cited support in the record amounts to a conclusory opinion.  See Johnson v. Astrue, 628 F.3d 991, 994 (8th Cir. 2011).

The ALJ provided good reason for giving Drs. Wilson and Loyo-Molina opinions some weight.  The ALJ found there were no objective findings in the record to support their opinions that Plaintiff was unable to sit for more than four hours in a day or more than one-half hour at a time. (Tr. 24).  The record reveals Plaintiff had a stable history of aortic valve replacement under oral coagulation. (Tr. 22, 356-359).  Dr. Wilson primarily monitored Plaintiff's anticoagulant therapy with little to no problems, and his treatment records did not corroborate the severe limitations he assessed. (Tr. 461-463, 714-715, 682-685).  The ALJ properly assigned less weight to Dr. Wilson's opinion because the reasoning Dr. Wilson provided seemed largely based on Plaintiff's subjective complaints.  See Kirby v. Astrue, 500 F.3d 705, 709 (8th Cir. 2007) (holding that the ALJ may give less weight to a medical opinion that is based largely on subjective complaints rather than on objective medical evidence).

Although Dr. Loyo-Molina cited dyspnea as the reason for the assessed limitations, just a month prior, Dr. Loyo-Molina noted Plaintiff had stable exertional dyspnea, palpitations, and lower extremity edema. (Tr. 322, 1014).  Medical evidence subsequent to the treating

18

physicians' opinions also supports the ALJ's findings.  For instance, on December 16, 2014, Dr. Loyo-Molina assessed that Plaintiff's chest pain was non-cardiac given the results of the coronary angiogram, no changes were made to her medication, and the next follow up visit was not until six months later. (Tr. 679).  The Court finds the ALJ properly discounted Drs. Wilson and Loyo-Molina's opinions after determining the assessments were not supported by objective evidence, and that the opinions contrasted with other evidence in the record. See Wagner v. Astrue, 499 F.3d 842, 849 (8th Cir. 2007).

Plaintiff further argues the ALJ erred when he assigned significant weight to the mental assessments provided by state agency medical consultants, Drs. Mourot and Daugherty, instead of the physical assessments made by treating physicians, Drs. Wilson and Loyo-Molina. (Doc. 11).  These opinions were not conflicting because the assessments provided by Drs. Mourot and Daugherty addressed Plaintiff's mental capabilities, and the opinions provided by Drs. Wilson and Loyo-Molina were physical assessments.

Nevertheless, the ALJ assigned significant weight to the opinions provided by the state agency medical consultants because they were consistent with the evidence of record as a whole. (Tr. 25).  For instance, on September 18, 2013, Plaintiff was diagnosed with major depressive disorder, single episode, moderate and Effexor was prescribed.  (Tr. 105, 395).  On October 29, 2013, Dr. Loyo-Molina diagnosed Plaintiff with anxiety. (Tr. 345).   When completing his analysis, Dr. Mourot noted Plaintiff's mental diagnoses did not continue into 2014, but Effexor was still refilled due to a positive effect on Plaintiff's hot flashes. (Tr. 388). The mental health treatment Plaintiff required was minimal with no limitations assessed in the treatment records, and thus the record as a whole supports Drs. Mourot and Daugherty's assessments that Plaintiff could perform unskilled work.  The only other mental assessment

provided in this case was a psychometric evaluation with intellectual testing by Dr. Back. (Tr. 1018-1021). The ALJ provided a thorough analysis of Dr. Back's opinion, and the Court concurs with the ALJ's finding that portions of Dr. Back's opinion were inconsistent with his own test results and the substantial evidence of record. (Tr. 25, 1018-1021).

Based upon the foregoing, the undersigned finds there is substantial evidence to support the ALJ's evaluation of the provided medical opinions, and the ALJ's opinion evaluation properly supports the RFC determination in this case.

**B.    Development of the Record:**

Plaintiff argues the ALJ failed to develop the record regarding how Plaintiff's headaches impact her ability to perform unskilled, sedentary work. (Doc. 11). The Court finds the ALJ had sufficient evidence to properly evaluated Plaintiff's headache impairment. The ALJ has a duty to fully and fairly develop the record. See Frankl v. Shalala, 47 F.3d 935, 938 (8th Cir.1995). The ALJ's duty to fully and fairly develop the record is independent of Plaintiff's burden to press his case. Vossen v. Astrue, 612 F.3d 1011, 1016 (8th Cir. 2010). The ALJ, however, is not required to function as Plaintiff's substitute counsel, but only to develop a reasonably complete record. "Reversal due to failure to develop the record is only warranted where such failure is unfair or prejudicial." Shannon v. Chater, 54 F.3d 484, 488 (8th Cir. 1995). "While an ALJ does have a duty to develop the record, this duty is not never-ending and an ALJ is not required to disprove every possible impairment." McCoy v. Astrue, 648 F.3d 605, 612 (8th Cir. 2011). "There is no bright line rule indicating when the Commissioner has or has not adequately developed the record; rather, such an assessment is made on a case-by-case basis." Mans v. Colvin, No. 13-CV-2103, 2014 WL 3689797 at *4 (W.D. Ark., July 24, 2014) (quoting Battles v. Shalala, 36 F.3d 43, 45 (8th Cir. 1994).

The medical evidence record supports the ALJ's RFC determination in regards to Plaintiff's headache impairment. On July 15, 2014, Plaintiff was diagnosed with headaches, and Dr. Wilson prescribed Gabapentin. (Tr. 758). Two weeks after starting the medication, Plaintiff reported the headaches were improving. (Tr. 754). On December 19, 2014, Plaintiff again reported Gabapentin helped with her headaches. (Tr. 714). In the Headache Questionnaire Dr. Wilson completed on January 14, 2015, Dr. Wilson wrote Plaintiff's headaches did not require emergency department visits in the last 12 months, and Gabapentin was prescribed for prophylaxis. (Tr. 675). However, Dr. Wilson later assessed in the questionnaire that Plaintiff's migraines interfere with her ability to work, and on average she would miss more than one day of work per week. (Tr. 675). Dr. Wilson's assessment regarding Plaintiff's headaches was inconsistent with the other evidence in the record, and thus additional RFC limitations due to headaches were unfounded. The ALJ accounted for Plaintiff's headaches in the decision by determining headaches were a severe impairment, and the RFC contained the limitation that Plaintiff "must avoid concentrated exposure to temperature extremes, noise, fumes, odors, dusts, gases, poor ventilation, and hazards." (Tr. 18, 20).

The Court finds the record before the ALJ contained the evidence required to make a full and informed decision regarding Plaintiff's capabilities to perform unskilled, sedentary work with Plaintiff's headache impairment taken into account. Accordingly, the undersigned finds the ALJ fully and fairly developed the record.

**V.    Conclusion:**

Based on the foregoing, the Court recommends affirming the ALJ's decision, and dismissing Plaintiff's case with prejudice. **The parties have fourteen days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C.**

21

**§ 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 2nd day of February, 2018.

/s/  *Erin L. Wiedemann*

HON. ERIN L. WIEDEMANN
UNITED STATES MAGISTRATE JUDGE